

**FILED & ENTERED**

MAY 04 2011

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY ngo        DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Case No: 8:10-bk-15501-TA |
| RAFIK YOUSSEF KAMELL, | Chapter: 11 |
| | AMENDED ORDER DENYING CONFIRMATION OF DEBTOR'S FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION |
| Debtor(s). | Date:     April 21, 2011<br>Time:     11:00 AM<br>Location: 5B |

    This case involves the perplexing question of whether the "absolute priority rule" survives the BAPCPA[1] amendments to individual Chapter 11 proceedings. This question has divided bankruptcy courts across the country. The court appreciates the learned and eloquent opinions of some judges to the contrary. But this court finds that there is no good reason to conclude that Congress intended to abrogate this long-standing and important centerpiece of Chapter 11 jurisprudence based on the ambiguous language of the BAPCPA amendments.

---

[1] Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8,119 Stat. 23 (2005).

- 1 -

The Chapter 11 debtor, Rafik Youssef Kamell, is a lawyer with an active personal injury practice.  The debtor also owns three real properties, his Whittier residence and two rental properties, one in Anaheim and the other in Newport Beach.  The confirmation hearing was continued for further briefing on the question of whether the plan is "fair and equitable" within the meaning of 11 U.S.C. §1129(b)[2] and/or feasible within the meaning of §1129(a)(11).  The debtor has provided additional declaration testimony which seems to resolve the feasibility question. The remaining "fair and equitable" issue is raised because the objecting creditor, JP Morgan Chase Bank ("the bank"), is an unsecured creditor by reason of the §506 bifurcation of its claim under the court's valuation at $1.6 million of its collateral, commonly known as 4004 W. Ocean Front, Newport Beach.  The valuation order results in two claims of the bank, one a claim secured by a trust deed at $1.6 million and the second is an unsecured claim of $1,324,062 for the deficiency.  Although not made clear in the papers, it would appear that the dissent and objection to confirmation from the bank on account of its $1,324,062 unsecured claim is large enough to prevent the Class 5 unsecured class from accepting the plan within the meaning of §1126(c).

There is no dispute that the plan does not provide for payment in full of the Class 5 unsecured claims.  Instead, Class 5, including the bank's deficiency, is promised only a *pro rata* portion of the debtor's projected disposable income for the period of five years following confirmation. Because of the dissent of Class 5, not all impaired classes have accepted the plan as required in §1129(a)(8), so the debtor to confirm must resort to the cram down provisions of §1129(b).  Cram down may be accomplished under §1129(b)(1) if only compliance with §1129(a)(8) is lacking and "if the plan does not discriminate unfairly, and is

---

[2] All statutory citations are to Title 11, United States Code, unless otherwise indicated.

- 2

fair and equitable, with respect to each class of claims or interests that is impaired under and has not accepted the plan…" Unfair discrimination is not contested here; the bank only contends that the plan as to Class 5 is not "fair and equitable." "Fair and equitable" is defined when applied to a dissenting class of impaired unsecured creditors at §1129(b)(2)(B), to allow confirmation notwithstanding the dissent if:

> (B)(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property *except that in a case in which the debtor is an individual, the debtor may retain property **included in the estate under section 1115**, subject to the requirements of subsection (a)(14) of this section.* (Italics and emphasis added).

The provisions not italicized in subsection (ii) are commonly referred to as the "absolute priority rule." The question arises whether the language italicized above, which was added under BAPCPA, has effectively abrogated the absolute priority rule entirely for individual Chapter 11s. This question has engendered a split of authority because the additional language in this section and in new §1115, also added under BAPCPA and referenced in §1129(b)(2)(B)(ii), is worded vaguely. Section 1115 in pertinent part reads:

> (a) In a case in which the debtor is an individual, property of the estate includes, in addition to the property specified in section 541–
> (1) all property of the kind specified in section 541 that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12 or 13, whichever occurs first; and
> (2) earnings from service performed by the debtor after the commencement of the case but before the case is closed, dismissed , or converted to a case under chapter 7, 12 or 13, whichever occurs first…"

An ambiguity arises over what is meant by the term "*included in* the estate under section 1115" (emphasis added) as used in §1129(b)(2)(B)(ii) since §1115 begins by providing that the usual definition of "property of the estate" defined at §541 is now augmented in individual 11s by certain after-acquired property and post-petition earnings. Indeed, new §1115 echoes this question by use of the very word "includes" in the initial paragraph, suggesting that new categories of property are "in addition to" what has historically defined property of the estate in §541.

The first three courts to take up the issue as well as some of the commentators ascribe to the "broad view" that Congress intended to entirely abrogate the absolute priority rule in individual cases. *See In re Tegeder*, 369 B.R. 477 (Bankr. Neb. 2007); *In re Roedemeir*, 374 B.R. 264 (Bankr. D. Kan. 2007) and *In re Shat*, 424 B.R. 854 (Bankr. D. Nev. 2010). The "broad view" holds that the entirety of §1129(b)(2)(B), including both subsections (i) and (ii)[3], simply have no continued application at all in individual cases. Courts ascribing to the "broad view" infer a Congressional intent to make individual Chapter 11's parallel to Chapter 13, which has never contained any version of the "absolute priority rule." Some BAPCPA additions do show intent to make some aspects of individual Chapter 11's more parallel to Chapter 13. For example: post petition earnings and acquisitions are now property of the estate under §1115, similar to §1306; under §1123(a)(8) debtors are now called upon to contribute all or a portion

---

[3] The "broad view" necessarily eliminates subsection (B)(i) as well, even though none of its language was amended in BAPCPA, because otherwise the statute would express a nonsensical and harsh alternative in (B)(i) to a much more lenient if not entirely inapplicable subsection (B)(ii) which, in the "broad view," allows the individual debtor to keep all of his pre-petition property and all post-petition property not already dealt with at §1129(a)(15). This is another reason the court doubts the "broad view," because it makes subsections (B)(i) and (B)(ii), expressed as alternatives, into an absurdity. Since the BAPCPA language referencing individuals is only included in alternative (B)(ii), (B)(i) remains there as a nullity respecting individuals in the "broad view." Statutes are better interpreted so as to give some operative effect to all of their language. *TRW, Inc. v. Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 449 (2001) *citing Duncan v. Walker*, 533 U.S. 167, 174, 121 S.Ct. 2120 (2001); *U.S. v. Nordic Village, Inc.*, 503 U.S. 30, 36, 112 S.Ct. 1011, 1015 (1992).

of post-petition earnings to repay creditors, not unlike §1322(a); like §1328, discharge is now delayed in most cases until all payments are made under §1141(d)(5), and modification, notwithstanding substantial consumption, is permitted in individual 11's just like in §1329. So the "broad view" courts read into the language of §§1129(b)(2)(B)(ii) and 1115 an intent to abrogate the absolute priority rule entirely, like in Chapter 13. However, this may be a "bridge too far."[4] As discussed herein, that reading seems rather convoluted and strained considering the language Congress actually used and further considering that, in general, BAPCPA has been read to tighten, not loosen, the ability of debtors to avoid paying what can reasonably be paid on account of debt. *In re Gbadebo*, 431 B.R. 222, 229 (Bankr. N.D.Cal. 2010). It seems to the court that had such a major protection for creditors as the absolute priority rule been abrogated, not only would this have been a theme counter to the rest of BAPCPA, but Congress would have said so more clearly.

The more recent trend, and now the clear majority of courts, ascribe to the so-called "narrow view." *See e.g. In re Gbadebo*, 431 B.R. 222; *In re Mullins*, 435 B.R. 352 (Bankr. W.D. Va. 2010); *In re Steedley,* No. 09-50654, 2010 WL 3528599 (Bankr. S.D.Ga. Aug. 27, 2010); *In re Gelin*, 437 B.R. 435 (Bank. M.D. Fla. 2010); *In re Karlovich*, _B.R._, 2010 WL 5418872 (Bankr. S.D.Cal. Nov. 16, 2010); *In re Stephens*, _B.R. _, 2011 WL 719485 (Bankr. S.D.Tex. Feb. 22, 2011); *In re Walsh,* _B.R._, 2011 WL 867046 (Bankr. D. Mass. March 9, 2011). Many of the "narrow view" courts observe that had Congress intended to abrogate the absolute priority rule entirely, rather than only partly, they could scarcely have chosen a more

---

[4] Attributed originally to Lt. General Frederick "Boy" Browning who reportedly commented that British General Montgomery's WWII "Operation Market Garden" was overambitious in its plan to capture the bridge at Arnhem in occupied Holland which resulted in the disastrous loss of thousands of British soldiers, although several closer bridges were captured successfully by Allied forces. In popular idiom it has come to describe any plan that is flawed because it is excessive or goes too far.

convoluted and ambiguous way to go about it.  As several "narrow view" courts have observed, it would have been easier and more logical to simply insert "except in individual cases" at the beginning of §1129(b)(2)(B). *Karlovich,* 2010 WL 5418872 at *4.

The court disagrees with both debtor's and the bank's arguments that the "plain meaning rule" has any application here. *See e.g. Lamie v. United State Trustee*, 540 U.S. 526, 534, 124 S.Ct. 1023 (2004); *In re Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026 (1989).  The language used in both §§1129(b)(2)(B)(ii) and in 1115 is ambiguous as many of the "narrow view" and "broad view" courts have noted. Moreover, the legislative history is also scarce, equivocal and altogether unhelpful. *In re Gbadebo*, 431 B.R. at 228-29 *citing In re Roedemeir*, 374 B.R. at 264-65 and *In re Shat,* 424 B.R. at 859-60.  The court is left unaided by any general precepts of statutory interpretation in its task of making some sense of ambiguous language.[5]  Does "included in" as used at §1129(b)(2)(B)(ii) mean the equivalent of "added to" through §1115, since property of the estate has long been defined under §541? This interpretation would be somewhat consistent with the language of §1115 itself which begins with an introductory reference of "*in addition to* the property specified at section 541…" (italics added)  Or does this language "included in" mean something closer to "referenced" which the *Shat* court thought meant §541 was merely "absorbed" and "superseded" into §1115 for individual 11's?  *Shat*, 424 B.R. at 864-65

The court does agree that in situations like this one statutory analysis is a "holistic endeavor" which means that insight can be garnered by considering how the same terminology

---

[5] However, see note 3 in which the court observes that the "narrow view" has the virtue of making sense of all of the statutory language and avoids leaving any portion a nullity.

is used elsewhere in a context that makes its meaning clear or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law. *United Savings Assn. of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 371, 108 S. Ct. 626, 630 (1988).

The court is not persuaded by this vague language that Congress meant to abrogate the absolute priority rule out of individual chapter 11s entirely. The absolute priority rule has been a mainstay of Chapter 11 and predecessor practice since at least the 1930's. *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 60 S. Ct. 1 (1939). If the railroad reorganization cases are also considered, the absolute priority rule or something very like it has been acknowledged as far back as at least the 1890's. *See e.g. Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 202, 108 S. Ct. 963, 966 (1988) *citing Louisville Trust Co. v. Louisville N.A. & C.R. Co.*, 174 U.S. 674, 684, 19 S. Ct. 827, 830 (1899). It has long been held that major changes to existing practice will not be inferred unless clearly mandated. *Dewsnup v. Timm,* 502 U.S. 410, 112 S. Ct. 773 (1992) *citing United Savings Assn. of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 380, 108 S.Ct. 626, 634 (1988); *Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 563, 110 S.Ct. 2126, 2133 (1990); *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 244-245, 109 S. Ct. 1026, 1032-1033 (1989). Further, as observed by the U.S. Supreme Court when it upheld application of the "absolute priority rule" in *Norwest Bank Worthington v. Ahlers,* despite the newly enacted Chapter 12, "[W]here, as here, Congress adopts a new law…[it] normally can be presumed to have had knowledge of the interpretation given to the [old] law." 485 U.S. at 211, 108 S. Ct at 971 *citing Lorillard v. Pons*, 434 U.S. 575, 581, 98 S. Ct. 866, 870 (1978).

From such awkward and convoluted language the court cannot infer that Congress truly intended such a wide and important change to individual Chapter 11 practice as discarding the absolute priority rule.  This is particularly so since the whole "sweat equity" theory of "new value" was so carefully discussed by the Supreme Court in *Norwest Bank Worthington v. Ahlers,* which held that contributions of new value must be "money or money's worth." 485 U.S. at 202-203, 108 S. Ct. at 966-67, *citing Case v. Los Angeles Lumber,* 308 U.S. at 121-22, 60 S. Ct. at 967-68. Presumably, post-petition earnings contributed to a plan indeed constitute "money or money's worth," and are not mere "sweat equity," as indeed now these kinds of property are part of the estate.    In this the court both agrees and disagrees with the *Shat* court, which noted the "broad view" effectively overrules *Norwest Bank Worthington v. Ahlers* in individual cases.  The court agrees that such a momentous change should have at least merited a mention in the legislative history.  *Shat,* 424 B.R. at 867.  But the court infers from this omission the opposite conclusion, i.e. that there was no intent to abrogate the absolute priority rule by including into the estate future earnings since this inclusion does not address existing property one way or the other.  So it is easier for the court to view the BAPCPA amendments as complimentary to the existing jurisprudence surrounding the "absolute priority rule." Indeed, as discussed below, the careful distinction in the BAPCPA amendments between that portion of post petition earnings which must be devoted to a plan in the event of objection of a single creditor under §1129(a)(15), and the entirety of the post petition earnings and acquisitions until the case is closed, dismissed or converted which are now defined as property of the estate in §1115(a), suggests to the court that the drafters intended to keep the absolute priority rule as pertains to pre-petition assets as a further barrier to cram down under §1129(b)(2)(B).

The court unlike the "broad view" courts finds no clear indication that Congress intended that individual chapter 11's become just like large 13's.  Just because Chapter 13 does not have the absolute priority rule is not alone sufficient to justify the rather tortured reading of §§1129(b)(2)(B)(ii) and 1115 engaged in by the "broad view" courts. Why couldn't the debt limitations of §109(e) have been simply raised had Congress intended to make all larger individual reorganization cases alike?  Clearly, Congress instead intended that the separate requirements of disclosure, voting, determination by percentages of "consenting" impaired classes and other protections unique to Chapter 11 continue to have some application in larger individual reorganization cases.  Moreover, resort to the tortured interpretation found in the "broad view" cases is unnecessary given a likely better explanation of how the statutes are supposed to work in tandem, as discussed below.

The court finds it at least equally plausible that Congress merely intended to make individual and non-individual Chapter 11 debtors more alike by including in the estate of an individual under §1115 post-petition property and earnings, but at the same time avoiding through §1129(b)(2)(B)(ii) the untenable situation that an individual cannot keep *any* of his post-petition earnings for the entire period of his plan nor any pre-petition property if he must resort to cram down.  There is clearly a distinction after BAPCPA between what an individual chapter 11 debtor facing objection *may* devote in post-petition property and earnings, and what post-petition property he *must* devote to the plan.  Section 1115 provides that *all* post petition earnings and acquisitions until the case is closed, converted or dismissed are property of the estate. The debtor facing objection of a single creditor must in any case devote at least a value equivalent to what he earns as "projected disposable income" in the 5-year period beginning

- 9

with the first payment under 11 U.S.C. §1129(a)(15)(B), or for any longer term of the plan. But without some amelioration in §1129(b)(2)(B)(ii), there would be, in effect, an oppressive and lengthy servitude imposed upon the individual Chapter 11 debtor for the entire period of the plan as a price for achieving any cram down. Unlike Chapter 13, a Chapter 11 plan might last for many years more than the 5-yr maximum since there is no Chapter 11 analog to §1325(b)(4). Further, the minimum contribution required in §1129(a)(15)(B) is carefully expressed in terms of "projected disposable income," which necessarily implies deduction of certain living expenses as described in §707(b)(2)(A). In contrast, the property included in the estate under §1115 includes all post petition earnings, not limited by deduction for monthly expenses. So, if the "absolute priority rule" persisted after BAPCPA it would have prevented the debtor from keeping *any* of his post-petition earnings as the price for cram down; thus enters the necessary amelioration in §1129(b)(2)(B)(ii). Obviously, forfeiting all post-petition income would have been at least difficult if not impossible in almost all individual cases. So, the "absolute priority rule" had to be amended to let the debtor keep enough of his post petition earnings to sustain his livelihood. But this is as far as one needs to go to make sense of the new statutory scheme. There is simply no reason to include the further subject of existing, pre-petition property.

The court sees instead a Congressional effort to balance benefits and hardships in cram down for Chapter 11 individuals. After BAPCPA, the debtor facing opposition of any one unsecured creditor must devote 5 years worth of "projected disposable income," at a minimum (or longer if the plan is longer). But debtor is not compelled to give also his additional earnings or after-acquired property net of living expenses beyond five years unless the plan is proposed

for a period longer than five years.  But there is no compelling reason to also conclude that *pre*petition property need not be pledged under the plan as the price for cram down, just as it has always been.  This does unnecessary violence to well-established jurisprudence.  Cram-down is not necessary to deal with a single unsecured creditor's objection which is already addressed at §1129(a)(15).  Cram-down is only triggered where *an entire class of unsecured creditors* have dissented from the plan.  Therefore, it is logical to assume that Congress understood that, in cram-down, the stakes should be a notch higher, i.e. no pre-petition assets and only a portion of post-petition assets can be kept under §1129(b)(2)(B)(ii).  This "narrow view" better explains the peculiar wording of §1115 and the reference of "included in" found at §1129(b)(2)(B)(ii). In overall effect, application of the absolute priority rule is the same both before and after BAPCPA.  *See e.g. Karlovich*, 2011WL 5418872 at *4.  Moreover, the careful reference in §1129(b)(2)(B)(ii) to only §1115 *and not to §541* preserves the distinction between existing assets and those acquired post-petition because of the way §1115 is worded (which clearly makes post-petition earnings and acquisitions *an addition* to §541 property).  Had the "broad view" been correct it would have been far more logical to simply reference "property of the estate" generally or, better yet, to simply make application of §1129(b)(2)(B) inapplicable in individual cases.

Moreover, the court is not impressed with the argument that continued application of the absolute priority rule makes Chapter 11 unworkable in most individual cases.  The debtor may still negotiate plan acceptance from impaired unsecured classes, pay dissenting classes in full, contribute the pre-petition property and/or contribute "new value" in order to achieve confirmation in compliance with the absolute priority rule.  Retention of these limitations is

more consistent with general approach of BAPCPA, which is to make individual debtors pay more within their means toward debt, not less.

In sum, the court finds the "narrow view" more persuasive and holds that the absolute priority rule for individual Chapter 11 debtors was only modified, not fully abrogated, by BAPCPA. This court therefore adds its voice to the "narrow view" courts. Since in this plan debtor proposes to keep substantial prepetition property without paying the dissenting Class 5 unsecured creditors in full, the plan cannot be confirmed in its current form.

###

DATED: May 4, 2011

*Theodor C. Albert*
United States Bankruptcy Judge

**NOTE TO USERS OF THIS FORM**:

**1)** Attach this form to the last page of a proposed Order or Judgment.  Do not file as a separate document.
**2)** The title of the judgment or order and all service information must be filled in by the party lodging the order.
**3) Category I.** below:  The United States trustee and case trustee (if any) will always be in this category.
**4**) **Category II.** below:  List ONLY addresses for debtor (and attorney), movant (or attorney) and person/entity (or attorney) who filed an opposition to the requested relief. DO NOT list an address if person/entity is listed in category I.

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*) AMENDED ORDER DENYING CONFIRMATION OF DEBTOR'S FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner indicated below:

**I. SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order. As of May 3, 2011, the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below.

Robert P Goe    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
Michael J Hauser    michael.hauser@usdoj.gov
Christopher M McDermott    ecfcacb@piteduncan.com
Ramesh Singh    claims@recoverycorp.com
Nathan F Smith    nathan@mclaw.org
Eric J Testan    ecfcacb@piteduncan.com
United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

☐ Service information continued on attached page

**II. SERVED BY THE COURT VIA U.S. MAIL:** A copy of this notice and a true copy of this judgment or order was sent by U.S. Mail to the following person(s) and/or entity(ies) at the address(es) indicated below:

Rafik Youssef Kamell
800 South Beach Blvd Ste F
La Habra, CA 90631

☐ Service information continued on attached page

**III. TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by U.S. Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s) and/or email address(es) indicated below:

☐ Service information continued on attached page